IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

APRIL LEONARD,                          )
     Plaintiff,                        )
                                 )
                                 )
         v.                             )     Civil No. 3:17cv730 (REP)
                                 )
NANCY A. BERRYHILL,                      )
Acting Commissioner of Social Security,  )
     Defendant.                        )
_____)

## REPORT AND RECOMMENDATION

On January 25, 2015, April Leonard ("Plaintiff") applied for Social Security Disability Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from severe osteoarthritis in her right knee with leg bows, severe osteoarthritis in her left knee, disc bulge and a herniated disc in her back, costochondritis (ribs),[1] uterine fibroids, carpel tunnel in both wrists, tennis elbow, sciatica nerve pain and fibromyalgia with forgetfulness and brain fog, with an alleged onset date of December 17, 2012. The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in (1) assigning limited weight to lay witness testimony and

---

[1]    Costochondritis consists of "inflammation of the cartilaginous junction between a rib or ribs and the sternum." *Costochondritis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

(2) evaluating only objective medical evidence while ignoring Plaintiff's subjective complaints in reaching his decision. (Mem. in Support of Pl.'s Mot. For Summ. J. ("Pl.'s Mem.") (ECF No. 9) at 6-8.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[2] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.  PROCEDURAL HISTORY

On January 25, 2015, Plaintiff filed an application for DIB with an alleged onset date of December 17, 2012. (R. at 177-78.) The SSA denied these claims initially on April 24, 2015, and again upon reconsideration on June 12, 2015. (R. at 95-99, 103-09.) At Plaintiff's written request, the ALJ held a hearing on January 5, 2017. (R. at 32.) On March 8, 2017, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act, because Plaintiff had the residual functional capacity ("RFC") to perform sedentary work and could have performed her past relevant work as a mortgage clerk. (R. at 20, 25.) On September 8, 2017, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1.)

---

[2]  The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts.  An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).  To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477.  If substantial evidence in the record does not support the

3

ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's RFC, accounting for the most that the claimant can do despite her physical and mental limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III.   THE ALJ'S DECISION

On January 5, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 32.) On March 8, 2017, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 12.)

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim. (R. at 17-27.) At step one, the ALJ found that the claimant had not engaged in substantial gainful activity during the period from her alleged onset

date of December 17, 2012, through her date last insured of December 31, 2014.  (R. at 17.)  At step two, the ALJ found that the claimant had the following severe impairments through the date last insured: bilateral knee osteoarthritis; epicondylitis;[3] degenerative disk disease of the lumbar spine; carpal tunnel syndrome; obesity; fibromyalgia; and rheumatoid arthritis.  (R. at 17.)  At step three, the ALJ determined that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). (R. at 18.)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff could perform sedentary work as defined in 20 CFR § 404.1567(a) with additional limitations.  (R .at 20.)  Specifically, the ALJ found that Plaintiff could frequently lift and carry less than ten pounds.  (R. at 20.)  Plaintiff could sit for a total of six hours and stand or walk for two hours in an eight-hour work day, requiring a cane or walker to ambulate.  (R. at 20.)  Plaintiff could also frequently finger with her right dominant hand and could constantly push or pull with both of her hands.  (R. at 20.) Plaintiff could occasionally operate foot controls with both of her feet, climb stairs or ramps, and balance, stoop, kneel, crouch or crawl; however, Plaintiff could never climb ladders, ropes or scaffolds.  (R. at 20.)  Plaintiff could never tolerate exposure to unprotected heights and could occasionally handle exposure to extreme cold.  (R. at 20.)  Plaintiff further required a sit/stand option that would allow her to stand for two to three minutes each hour during the workday.  (R. at 20.)

---

[3]     Epicondylitis consists of inflammation of an epicondyle of the humerus or of the tissues adjoining it, usually resulting from an over use injury. *Epicondylitis*, <u>Dorland's Illustrated Medical Dictionary</u> (32d ed. 2012).

At step four, the ALJ found that Plaintiff could perform past relevant work as a mortgage clerk. (R. at 25.)  Although Plaintiff could perform past relevant work, the ALJ also determined that Plaintiff could perform other jobs existing in significant numbers in the national economy, including the jobs of data clerk, credit card clerk and card processing clerk. (R. at 25-26.) Accordingly, the ALJ found that Plaintiff did not qualify as disabled under the Act.

IV.   ANALYSIS

Plaintiff, age forty-six at the time of this Report and Recommendation, previously worked as a mortgage clerk. (R. at 214.)  She applied for DIB, alleging disability from severe osteoarthritis in her right knee with leg bows, severe osteoarthritis in her left knee, disc bulge in her back, herniated disc in her back, costochondritis (ribs), uterine fibroids, carpel tunnel in both wrists, tennis elbow, sciatica nerve pain and fibromyalgia resulting in forgetfulness and brain fog, with an alleged onset date of December 17, 2012. (R. at 191, 195.)  Plaintiff's appeal to this Court alleges that the ALJ erred by (1) assigning limited weight to lay-witness testimony and (2) ignoring Plaintiff's subjective complaints in reaching his decision. (Pl.'s Mem. at 6-9.)  For the reasons set forth below, the ALJ did not err.

### A.   The ALJ Did Not Err in Assigning Limited Weight to Lay-Witness Testimony.

Plaintiff argues that the ALJ erred in assigning limited weight to the written testimony of Plaintiff's friend, Ms. Adele LaNew. (Pl.'s Mem. at 8-9.)  Defendant responds that the ALJ appropriately evaluated Ms. LaNew's testimony in accordance with 20 C.F.R. § 404.1513, which permits the ALJ to use evidence from non-medical sources at his discretion. (Def.'s Mot. Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 10.) at 15-18.)  Defendant further asserts that substantial evidence supports the ALJ's decision, because Ms. LaNew's testimony lacked consistency with the record evidence. (Def.'s Mem. at 16.)

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

The ALJ "may receive evidence from nonmedical sources." 20 C.F.R. § 404.1513. Other nonmedical sources, such as a claimant's family members or friends, "may provide information from which inferences and conclusions may be drawn about the credibility of the individual's statements." SSR 96-7p.[4] In evaluating this type of evidence, the ALJ should consider factors such as "the nature and extent of the relationship between the source and the individual," as well as "whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." SSR 06-03p. [5]

---

[4] Effective March 28, 2016, SSR 16-3p superseded SSR 96-7p. Plaintiff filed her claim on January 25, 2015, before this regulation took effect. (R. at 94.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power.) Because the regulation does not have retroactive effect, SSR 96-7p applies to Plaintiff's claim.

[5] Effective March 27, 2017, the SSA rescinded SSR 06-03p, instead incorporating some of the Ruling's policies into 20 C.F.R. § 404.1527. 82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her claim on January 25, 2015, before the SSA rescinded the Ruling. (R. at 94.) Because the Agency cannot engage in retroactive rulemaking, SSR 06-03p applies to Plaintiff's claim.

Additionally, the ALJ may consider the time frame of the evidence. The relevant time period spans from the alleged onset — December 17, 2012 — through the date last insured — December 31, 2014. Plaintiff *must* prove her disability within that time frame. 20 C.F.R. §§ 404.101(a), 404.130; *Johnson*, 434 F.3d at 655-56. While the ALJ may consider evidence created after the date last insured, the evidence must provide a link to Plaintiff's condition *before* the date last insured. *Bird*, 699 F.3d at 340-41. Evidence "not linked in any manner to the claimant's condition before her [date last insured]" has no relevance to the ALJ's determination, and the ALJ does not need to retroactively consider it. *Johnson*, 434 F.3d at 655-56.

In her December 9, 2016 letter, Ms. LaNew stated that Plaintiff had difficulty "doing everyday tasks." (R. at 260.) According to Ms. LaNew, Plaintiff struggled with getting out of bed in the morning, getting dressed, combing her hair and putting on makeup. (R. at 260.) Ms. LaNew also stated that Plaintiff had difficulty "bending or lifting weight" and often needed assistance from family members to reach or lift heavy items while grocery shopping. (R. at 260.) Ms. LaNew noted that Plaintiff had difficulty walking and that Plaintiff "walk[ed] with a limp favoring the hips and knees that are swollen and painful." (R. at 260.) Ms. LaNew described Plaintiff's hands as swollen and aching, and she reported that Plaintiff had difficulty using her hands to write and eat. (R. at 260.) Ms. LaNew wrote that "[e]ven with pain medication, [Plaintiff's] activities [had] become increasingly limited over the time [that Ms. LaNew had] known her." (R. at 261.) Ms. LaNew also reported that Plaintiff "[took] advantage of things to help her manage [her limitations]." (R. at 261.) For example, Plaintiff leaned on a cart while shopping in the store and used a grab-it device to reach things. (R. at 261.)

---

In his opinion, the ALJ noted that Ms. LaNew "witnessed firsthand the claimant's difficulties with prolonged sitting, standing, walking and manipulation secondary to chronic pain." (R. at 24.)  The ALJ also noted that, in Ms. LaNew's opinion, Plaintiff's impairments "significantly impacted her ability to maintain basic activities of daily living resulting in frustration and rendering her disabled." (R. at 24.)  However, after considering the various factors listed in SSR 06-03p, the ALJ concluded that Ms. LaNew's testimony deserved only limited weight for two reasons. (R. at 24.)  First, unlike "medical opinions that are rendered by a medical source," the ALJ explained that Ms. Lanew's lay testimony lacked "exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms." (R. at 24.)  Indeed, Ms. LaNew reported that she watched Plaintiff's pain "worsen over four years" and that she had could recognize Plaintiff's pain based on her facial expressions and use of curse words, but Ms. LaNew did not provide any detailed medical analysis. (R. at 260-62.)  Second, the ALJ discounted Plaintiff's opinion, because Ms. LaNew's close relationship with Plaintiff detracted from her objectivity. (R. at 24.)  In her letter, Ms. LaNew described Plaintiff as a friend of five years with a "remarkable" spirit. (R. at 260-61.)  Plaintiff and Ms. LaNew attended the same church and took a three-month class together. (R. at 260.)  The ALJ explained that opinions from third parties with "a close personal relationship with the claimant cannot be considered the observations of a disinterested third party whose opinion would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges by virtue of their relationship." (R. at 24.)  Accordingly, the ALJ only credited Ms. LaNew's testimony to the extent that it comported with the objective medical evidence. (R. at 24.)

Ultimately, the ALJ adequately considered the various relevant factors listed in SSR 06-03p and explained his reasoning for assigning limited weight to Ms. LaNew's testimony. Thus, Plaintiff's argument that the ALJ assigned "no real weight . . . to anything other than objective medical findings" lacks merit. (Pl.'s Br. at 9.) Moreover, substantial evidence, including objective medical evidence, Plaintiff's own testimony and the opinions of the state agency physicians, support the ALJ's decision.

### 1.  Ms. LaNew's Testimony Lacks Consistency with the Objective Medical Evidence in the Record.

In December 2011, Plaintiff presented to Eric Krushinski, M.D., at Orthopedic Specialty Clinic, in Fredericksburg, Virginia, complaining of right knee pain. (R. at 285.) Plaintiff told Dr. Krushinski that her knee pain returned following an Orthovisc injection. (R. at 285.) Although Plaintiff walked with a slight antalgic gait during the appointment, she denied pain in her hip, and Dr. Krushinski opined that Plaintiff's "symptoms [appeared] intermittent and aggravating but not disabling at this point." (R. at 285.) On January 27, 2012, Plaintiff returned and complained of left knee pain, but Dr. Krushinski noted that Plaintiff had normal alignment, as well as normal strength and sensation. (R. at 286.) Ultimately, Dr. Krushinski elected to inject Plaintiff's knee with cortisone. (R. at 286.)

On May 10, 2012, Plaintiff returned to Orthopedic Specialty Clinic, stating that she experienced back pain after her daughter struck her on the back with a shovel while doing yard work. (R. at 288.) After receiving medication for the pain, Plaintiff returned to Orthopedic Specialty Clinic on June 19, 2012, and Joseph Gowaty, a physician's assistant, stated that Plaintiff's neck and lower back exams appeared normal. (R. at 289.)

On August 7, 2012, Dr. Krushinski again examined Plaintiff. (R. at 290.) During that appointment, Plaintiff stated that her knees generally felt better and that "[s]he felt significant

improvement since being prescribed Flexeril for her thoracic back." (R. at 290.) Plaintiff also walked with a normal gait and illustrated normal strength and sensation "throughout the lower extremity." (R. at 290.) On October 22, 2012, during an appointment with Urology Associates of Fredericksburg, Plaintiff again demonstrated normal gait and station, as well as normal inspection of digits and nails, normal stability, muscle strength and tone, and full range of motion in her head, neck, spine, ribs, pelvis and extremities. (R. at 279.)

Mr. Gowaty re-examined Plaintiff at Orthopedic Specialty Clinic on November 1, 2012, and noted that a computed tomography ("CT") scan of Plaintiff's lumbar spine revealed "only mild degenerative changes." (R. at 291.) Plaintiff demonstrated normal gait, balance and coordination, and also chose to "hold off" on treatment options such as therapy and injections. (R. at 291.) Plaintiff revisited Ms. Gowaty on November 29, 2012, and again exhibited normal gait, balance and coordination, remarking that Flexeril helped her back pain. (R. at 293.) Plaintiff also declined further treatment options including interventional injections. (R. at 293.)

On February 11, 2013, Plaintiff treated with Brian McDermott, M.D., reporting that the previous injections into her right knee had helped lessen the overall pain. (R. at 337.) Plaintiff also exhibited normal gait with good muscle tone in both knees and her right hip. (R. at 337.) However, during a follow-up appointment with Dr. McDermott on February 27, 2013, Plaintiff stated that the condition of her right knee had deteriorated. (R. at 335-36.) In response, Dr. McDermott administered another injection into Plaintiff's right knee. (R. at 335-36.) On June 24, July 1 and July 8, 2013, Dr. McDermott administered additional injections into both of Plaintiff's knees and recorded normal gait during each appointment. (R. at 329-33.)

On November 11, 2013, Plaintiff stated that the injections helped, but that she experienced some discomfort after using an elliptical machine. (R. at 326.) Nonetheless,

11

Plaintiff's lower right extremity showed good range of motion, and Dr. McDermott administered another injection into Plaintiff's right knee. (R. at 326-27.) Roughly one month later, on December 16, 2013, Plaintiff again walked with a normal gait and station during an appointment for hyperthyroidism. (R. 343-45.)

On January 14, 2014, Plaintiff attended an appointment for her wrist with Paul Sunshine, a physician's assistant at Orthopedic Specialty Clinic. (R. at 294.) Plaintiff complained of wrist pain after jamming her wrist, but Mr. Sunshine noted that the wrist "show[ed] no gross deformity" and had a "full and symmetrical" range of motion. (R. at 294.) Although Plaintiff's wrist had some soft tissue swelling, her "grip strength [appeared] strong." (R. at 294.) Plaintiff also affirmed that her wrist splint provided significant relief. (R. at 294.)

Plaintiff returned to Orthopedic Specialty Clinic on January 18, 2014, and reported that bracing helped alleviate her wrist pain. (R. at 296.) Plaintiff stated that physicians previously diagnosed her with mild carpal tunnel, but that she was "really not having that much of a problem" and that the symptoms "[did] not awaken [her] at night." (R. at 296.) Indeed, Plaintiff's wrist showed no signs of swelling or tenderness, and she had no pain with resistance to wrist or finger extension. (R. at 296.)

On February 26, 2014, Plaintiff attended a follow-up appointment with Dr. McDermott, reporting that she felt "very well" after her last knee injection and that she could even play with her daughter in the snow. (R. at 324.) Plaintiff's gait appeared normal and her knees and hips had good muscle tone with no instability. (R. at 325.) Plaintiff further noted that she could walk without a cane or assistive device. (R. at 324-25.) Ultimately, Dr. McDermott administered another injection of cortisone into both of Plaintiff's knees. (R. at 324-25.)

On February 27, 2014, Plaintiff returned to Orthopedic Specialty Clinic complaining of

12

wrist pain. (R. at 297.)  Notably, Plaintiff admitted that she had not been using her wrist splint. (R. at 297.)  Mr. Sunshine diagnosed Plaintiff with "right elbow lateral epicondylitis," noting that Plaintiff's right elbow showed "exquisite localizing tenderness." (R. at 297.)  Nonetheless, the attending physician decided that Plaintiff should continue to splint her wrist and wrap her elbow. (R. at 297.)

In May and June of 2014, Dr. McDermott administered three more rounds of injections into Plaintiff's knees, and Plaintiff again demonstrated normal gait during all three appointments. (R. at 320-22.)  However, during her June 11 injection appointment, Plaintiff stated that she had experienced "no significant improvement" in her symptoms. (R. at 320.)  And during her July 2 injection appointment, Plaintiff reiterated that the Orthovisc injections "ha[d] not improved her knee much and actually the right knee [felt] much more painful." (R. at 318.)

On November 6, 2014, Plaintiff attended an appointment with Heather Brown, a physician's assistant, complaining of lower back pain. (R. at 315.)  Plaintiff noted that her fibromyalgia could cause intermittent discomfort, but that this pain felt different. (R. at 315.) Specifically, Plaintiff felt a sharp stabbing pain when lifting bags out of a closet. (R. at 315.) Plaintiff walked with a normal gait, and Ms. Brown prescribed her an oral steroid. (R. at 315.)

Plaintiff returned for a follow-up appointment with Ms. Brown on December 24, 2014, affirming that she experienced some relief with oral medication. (R. at 314.)  Although a MRI of Plaintiff's back revealed a bulging disc and a herniated disc abutting the L5 and S1 nerve root, Ms. Brown suggested that Plaintiff continue with activity modification and core strengthening on her own "in lieu of formal therapy" and admonished Plaintiff to consider an epidural instead of surgical intervention if her symptoms did not improve. (R. at 314.)

On January 30, 2015, Plaintiff attended an appointment with Ali R. Hashemi, M.D., to

evaluate her bilateral hand pain. (R. at 306, 312.) Plaintiff reported that anti-inflammatories helped, but that she still experienced constant pain. (R. at 306, 312.) Dr. Hashemi noted that Plaintiff had noticeable pain and swelling, but a review of her systems otherwise proved negative for any issues. (R. at 306, 312.) Plaintiff exhibited a full range of motion in her elbows, wrists and fingers. (R. at 305.) Dr. Hashemi further noted that Plaintiff had "a little bit of an antalgic gait because of her right knee" and that her right knee exhibited a somewhat limited range of motion and tenderness to palpation. (R. at 313.) Regarding Plaintiff's hands, Dr. Hashemi opined that carpal tunnel caused most of Plaintiff's symptoms. (R. at 313.) Dr. Hashemi administered a cortisone injection and scheduled a follow-up appointment. (R. at 313.)

On February 13, 2015, Plaintiff returned for a follow-up appointment with Dr. Hashemi. (R. at 311.) Plaintiff stated that the injections had helped her, and she exhibited good digital range of motion, although she complained of generalized achiness. (R. at 311.) Dr. Hashemi remarked that "the injection helped [Plaintiff] markedly." (R. at 311.) Dr. Hashemi also offered Plaintiff an injection for her left wrist, but Plaintiff decided to "hold off." (R. at 311.)

On March 4, 2015, Plaintiff attended an appointment for hyperthyroidism and displayed normal gait and station, as well as normal use of her digits and nails. (R. at 341.) During an April 20, 2015 appointment, Plaintiff again exhibited normal gait, full muscle strength and positive Tinel's sign.[6] (R. at 422-32.)

Plaintiff saw Dr. McDermott again on May 11, 2015, after the date last insured, and received another set of injections into both of her knees. (R. at 459.) During this visit, Plaintiff stated that both knees continued to bother her, and that relief from the last set of injections

---

[6]    Tinel's sign consists of a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve. *Tinel's Sign*. Dorland's Illustrated Medical Dictionary (32d ed. 2012).

proved short-lived. (R. at 458.) Plaintiff also "noticed a limp and increased stiffness of both knees." (R. at 458.) Although Dr. McDermott indicated that Plaintiff had a normal gait and that both her knees and her hip showed good muscle tone, he predicted that Plaintiff would require knee replacement surgery. (R. at 458-59.)

On August 22, 2015, Plaintiff presented to Patricia K. Keenan, a physician's assistant, to have her knee pain re-examined. (R. at 456.) Although Plaintiff walked with a limp, Plaintiff displayed a full range of motion without pain in both hips and had intact sensation in the lower extremities. (R. at 456-57.) Plaintiff reported that cortisone injections only mildly helped her pain and wished to proceed with surgery. (R. at 456-57.) On September 27, 2015, Dr. McDermott evaluated Plaintiff's condition, noting again that Plaintiff walked with a limp and that cortisone injections only provided relief for a few weeks. (R. at 455.) Based on the severity of Plaintiff's knee arthritis and "failure with conservative measures[,]" Dr. McDermott suggested knee replacement surgery as Plaintiff's "best long-term option." (R. at 455.)

Accordingly, on December 1, 2015, Plaintiff underwent a total right-knee replacement. (R. at 450.) Plaintiff returned for reevaluation on December 31, 2015, reporting no complications after her surgery. (R. at 448.) Subsequent treatment records from January through February 2016 reveal that Plaintiff felt better and continued to make substantial progress post-knee surgery. (R. at 439-43, 445-47.) On March 9, 2016, Plaintiff stated that she felt better after the surgery, had discontinued her pain medicine, completed her physical therapy and denied any restrictions in her activities of daily living. (R. at 437.) Plaintiff also denied the use of a cane or assistive device for ambulation. (R. at 437.)

Plaintiff complained of left knee pain again during an appointment on July 29, 2016. (R. at 436.) But a few months later, on November 21, 2016, Plaintiff reported that her left knee

15

"ha[d] actually gotten better" since her right knee replacement surgery. (R. at 433.)  During that appointment, Plaintiff walked with a normal gait and had good muscle tone. (R. at 434.) Further, Dr. McDermott concluded that "[s]ince her left knee is feeling so much better, we're just going to continue with conservative care." (R. at 434.)

Plaintiff's longitudinal record contradicts Ms. LaNew's opinion as to Plaintiff's limitations.  Ms. LaNew did not provide specific dates for when she allegedly observed Plaintiff's struggles with her knee, back and wrist pain. (R. at 261.)  However, Plaintiff's medical records from August to December 2012, when Ms. LaNew stated that she began to observe Plaintiff's symptoms, indicate that Plaintiff walked with a normal gait and could engage in yoga and occasional cardiovascular exercise. (R. at 290, 291, 293.)  Dr. McDermott also indicated numerous times over the course of two years that Plaintiff walked with a normal gait and had normal muscle tone when he administered her knee injections. (R. at 318, 320-22, 324, 329, 331, 333, 335, 377, 458.)  This objective medical evidence directly contradicts Ms. LaNew's assertions regarding Plaintiff's limp and difficulty walking. (R. at 260.)

Ms. LaNew also stated that Plaintiff's "hands . . . swell[ed] and ache[d,] making fine finger movements, like writing [and] even eating, difficult." (R. at 260.)  However, Plaintiff's treatment records indicate that bracing Plaintiff's wrist helped alleviate her symptoms. (R. at 294.)  Indeed, Plaintiff displayed a full range of motion and strong grip strength during multiple appointments. (R. at 294, 305, 313.)

With respect to Plaintiff's condition post-surgery, Ms. LaNew stated that Plaintiff "used a walker and arranged her life activities so [that] she did [not] need to climb stairs." (R. at 261.)  Although this may have proven true immediately after Plaintiff's surgery, subsequent treatment records indicate that Plaintiff had a largely successful recovery. (R. at 433-34, 437, 439-43, 445-

47.)  While Plaintiff complained of left knee pain, walked with a limp and used a walker in July 2016, she reported improvement and displayed a normal gait during appointments in March and November 2016.  (R. at 433-39.)

Ms. LaNew's statements about Plaintiff's poor response to treatment also do not comport with the objective medical evidence of record.  Ms. LaNew stated that "even with pain medication, [Plaintiff's] activities have become increasingly limited."  (R. at 260.)  However, Plaintiff noted that her knee injections "seem[ed] to lessen the overall pain" and even reported that she could play with her daughter in the snow.  (R. at 324, 337.)  Oral medication improved Plaintiff's pain as well.  (*See, e.g.*, R. at 290 (noting that Flexeril "significantly" improved Plaintiff's back pain); R. at 314 (oral medication provided Plaintiff some pain relief).)  In March 2016, Plaintiff experienced such significant improvement following her knee surgery that she stopped taking pain medication and reported no restrictions in her activities of daily living.  (R. at 437.)  Moreover, Plaintiff did not always follow through with the treatments recommended by her care providers — including physical therapy, injections and medications — suggesting that Plaintiff experienced less severe symptoms than Ms. LaNew alleged.  (R. at 291, 293, 311); *see Dunn*, 607 F. App'x at 275-76 (finding noncompliance with a treatment regimen indicative of less severe symptoms).

Ultimately, the longitudinal record contradicts Ms. LaNew's statements about the persistence and severity of Plaintiff's conditions and supports the assignment of limited weight to Ms. LaNew's testimony.

### 2.   Ms. LaNew's Testimony Proved Inconsistent with Plaintiff's Own Statements.

In addition to the objective medical evidence, Plaintiff's own statements undermine Ms. LaNew's opinion, providing further substantial evidence to support the ALJ's assignment of

limited weight.  For example, although Ms. LaNew asserted that Plaintiff could not get up and dress herself without assistance, during her hearing with the ALJ, Plaintiff testified that she could do exactly those things.  (R. at 49, 260.)  Plaintiff also testified that she could text on a cell phone, contradicting Ms. LaNew's statement that Plaintiff's "hands . . . swell[ed] and ache[d,] making fine finger movements, like writing [and] even eating, difficult."  (R. at 47-48, 260.)  And Ms. LaNew's assertion that Plaintiff required assistance from family members to perform daily activities conflicts with Plaintiff's confirmation that she could vacuum using a lightweight vacuum cleaner, load the dishwasher, sweep her kitchen floor and wash her own clothing.  (R. at 50, 260-62.)  Plaintiff further stated she could assist in homeschooling her daughter, and that she originally quit working to go on maternity leave — not due to disability.  (R. at 24, 56, 58-59.)

Plaintiff's testimony during the hearing demonstrate that she possesses more autonomy and ability than Ms. LaNew endorsed, undermining Ms. LaNew's opinion.  The ALJ discussed Plaintiff's testimony in assigning limited weight to Ms. LaNew's opinion and in determining Plaintiff's overall RFC.  (R. at 24.)  Substantial evidence supports the ALJ's findings.

### 3.    The State Agency Medical Consultants' Opinions Support the ALJ's Decision.

Ms. LaNew's letter also conflicts with the opinions of the state agency physicians, which the ALJ assigned significant weight.  (R. at 23-24.)  State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation.  20 C.F.R. § 404.1513a(b)(1).  Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. § 404.1513a(b)(1).  Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to state agency opinions.  § 404.1527(e).

On April 23, 2015, Richard Surrusco, M.D., completed Plaintiff's disability

determination explanation at the initial level. (R. at 82-83.) After evaluating Plaintiff's medical records, Dr. Surrusco opined that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms; however . . . [Plaintiff's] statement concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with . . . [Plaintiff's] residual functional capacity assessment." (R. at 78.) On June 9, 2015, Donald Williams, M.D., completed Plaintiff's disability determination explanation on reconsideration. (R. at 92-93.) After considering "the totality of the evidence," Dr. Williams concluded that Plaintiff suffered from some of her alleged impairments, but that the medical evidence did not support Plaintiff's alleged severity of her medical impairments. (R. at 89.)

Both Dr. Williams and Dr. Surrusco stated that Plaintiff could frequently lift or carry ten pounds and could occasionally lift or carry twenty pounds. (R. at 79, 89.) The doctors determined that Plaintiff could stand or walk four hours and sit for a total of six hours during an eight-hour workday. (R. at 79, 89.) Plaintiff could frequently finger, but with limitations in her right hand. (R. at 80, 90.) Additionally, both Dr. Williams and Dr. Surrusco opined that Plaintiff could occasionally climb ladders, ropes, scaffolds, ramps, stairs, and could occasionally kneel, crouch, crawl and bend at the waist. (R. at 79-80, 90.) Ultimately, both Dr. Williams and Dr. Surrusco concluded that Plaintiff could perform sedentary work. (R. at 81, 92.)

The ALJ assigned the state agency physicians' opinions significant weight, noting that although the physicians did not personally examine Plaintiff, they had knowledge of the disability program, access to all of the medical evidence of record and based their opinion on objective medical evidence. (R. at 23-34.) In formulating Plaintiff's RFC, the ALJ adopted substantial portions of the state agency physicians' opinions. (R. at 20, 24.) Specifically, the ALJ agreed that Plaintiff could frequently lift or carry less than ten pounds, occasionally lift or

19

carry ten pounds and sit for six hours and stand or walk for two hours in an eight-hour work day. (R. at 20, 24.)  The ALJ further found that Plaintiff could occasionally climb ramps or stairs, as well as occasionally balance, stoop, kneel, crouch, or crawl.  (R. at 20.)  However, the ALJ disagreed with the state agency physicians' opinions in some respects, concluding that Plaintiff could frequently finger with the right dominant hand without limitations and could never — not occasionally — climb ladders, ropes or scaffolds.  (R. at 20.)

Substantial evidence supports the ALJ's decision to afford the state agency medical consultants' opinions significant weight.  Indeed, although Plaintiff exhibited an antalgic gait on two occasions in December 2011 and January 2015, (R. at 285, 305), Plaintiff's entire treatment history reveals a generally normal gait and range of motion both during the relevant period and after Plaintiff's knee replacement, (R. at 318, 320-22, 324, 329, 331, 333, 335, 337, 422-23, 458), supporting Drs. Williams' and Surrusco's opinion that Plaintiff could perform at least sedentary work with some postural limitations.  The evidence of record also supports the doctors' conclusions as to Plaintiff's exertional capacity, showing that Plaintiff experienced improvement in the strength of her wrists after conservative treatment, even choosing to hold off on injections.  (R. at 294, 297, 311.)  Given these and other consistencies between the state agency physician opinions and the evidence of record, the ALJ correctly relied upon them in reaching his decision.

The inconsistencies between the state agency physician opinions and Ms. LaNew's statements provide further support to the ALJ's assignment of limited weight to Ms. LaNew's testimony.  As previously mentioned, Ms. LaNew stated in her letter that Plaintiff "walks with a limp favoring the hips and knees that are swollen and painful."  (R. at 260.)  But the state agency physicians correctly noted that the overall record strongly demonstrated that Plaintiff had a

20

normal gait and range of motion. (R. at 89-91.) Further, Ms. LaNew stated that Plaintiff's hands "swell[ed] and ache[d,] making fine finger movements, like writing [and] even eating, difficult." (R. at 260.) Yet, the State agency medical consultants opined that Plaintiff's wrist injuries left her capable of frequently fingering, albeit with limited ability in her right hand. (R. at 80, 90.)

In sum, the state agency physician opinions, together with the objective medical evidence and Plaintiff's own testimony, support the ALJ's decision to afford Ms. LaNew's testimony limited weight. Thus, the ALJ did not err.

**B.    The ALJ Properly Evaluated Plaintiff's Subjective Symptoms.**

Plaintiff's second argument contends that the ALJ erred by accepting Plaintiff's subjective complaints only to the extent that objective medical evidence supported her claims. (Pl.'s Mem. at 6.) Specifically, Plaintiff alleges that the ALJ "evaluated no more than the objective medical evidence with respect to most, if not all, medically determinable impairments." (Pl.'s Mem. at 6.) Plaintiff further asserts that the ALJ's decision stands devoid of any "substantive discussion" of the various factors that the ALJ must consider under 20 C.F.R. § 404.1529. (Pl.'s Mem. at 6 (accusing the ALJ of paying only "lip service" to two factors: Plaintiff's activities of daily living and modalities of treatment). (Pl.'s Mem. at 6.)

Defendant responds that the ALJ properly applied the two-step analysis under 20 C.F.R. § 404.1529 in making "the evidentiary determination of the nature, intensity, frequency or severity of Plaintiff's symptoms and their impact on her ability to work." (Def.'s Mem. at 11-12.) In doing so, Defendant states that the ALJ "did not rely on objective medical evidence alone, but on the entire record." (Def.'s Mem. at 14.) Ultimately, Defendant maintains that the ALJ did not err, because, after considering all of the evidence including the relevant factors listed under 20 C.F.R. § 404.1529, the ALJ determined that "Plaintiff's statements about the

21

intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record."   (Def.'s Mem. at 12.)

### 1.   The ALJ Applied the Appropriate Two-Step Process in Evaluating Plaintiff's Subjective Symptoms.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1).  The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.  In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis.  *Craig*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. § 404.1529(a); SSR 96-7p (discussing ALJ's consideration of claimant's symptoms).  The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms.  *Id.*; SSR 96-7p, at 1-3.  The ALJ must consider all the medical evidence in the record.  *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13 (specifically stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added).

If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work.  *Craig*, 76 F.3d at 595.  The ALJ's evaluation must take into account "all the available evidence," including a credibility finding about the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the

individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11. This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Eldeco, Inc.*, 132 F.3d at 1011 (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff qualifies as disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, the ALJ stated that "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 21.) This statement came after the ALJ considered Plaintiff's subjective statements regarding her activities of daily living, specifically that "she independently maintains personal care, homeschools her daughter, and does some household chores although she requires assistance from family and community members." (R. at

21.)  Furthermore, the ALJ found that "[t]he claimant reported significant improvement with conservative treatment, although she complained of residual pain and achiness."  (R. at 22.) Ultimately, the ALJ concluded that Plaintiff had the RFC to perform sedentary work and that his findings proved "consistent with the evidence in the record as a whole, including examination findings, diagnoses, treatment, the claimant's reported activities of daily living, and all opinions the undersigned afforded evidentiary weight."  (R. at 24.)

The ALJ properly followed the two-step process in determining (1) whether the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms and (2) whether the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were consistent with the medical and other evidence of record.  20 C.F.R. § 404.1529; *Craig*, 76 F.3d at 594-95.  At step one, the ALJ found "that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (R. at 21.)  However, at step two, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects" of those symptoms lacked consistency with the medical evidence and other evidence in the record.  (R. at 21.)

Regarding step two, Plaintiff contends that the ALJ erred by evaluating only the objective medical evidence and that the ALJ's decision lacked "any substantive discussion" of the various factors listed under § 404.1529.[7]  (Pl.'s Mem. at 6.)  Specifically, Plaintiff argues that the ALJ

---

[7]  When evaluating a claimant's symptoms, such as pain, 20 C.F.R. § 404.1529(c)(3) provides that the ALJ will consider the following factors: "(i) [the claimant's] daily activities; (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [that the claimant] take[s] or ha[s] taken to alleviate [her] pain or other symptoms; (v) [t]reatment, other than medication, [that the claimant] receive[s] or ha[s] received for relief of [her] pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve [her] pain or other symptoms . . .; and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms."

did not adequately consider her activities of daily living. (Pl.'s Mem. at 6.) But a review of the ALJ's decision reveals that the ALJ did consider her activities of daily living, noting that "she independently maintains personal care, homeschools her daughter, and does some household chores[,] although she requires assistance from family and community members." (R. at 21.) The ALJ also noted that fatigue limits the claimant in these activities. (R. at 20, 21.)

Plaintiff further asserts that the ALJ merely mentioned Plaintiff's treatment "in passing." (Pl.'s Mem. at 7.) However, the ALJ referenced Plaintiff's treatment multiple times throughout his consideration of Plaintiff's subjective complaints. First, the ALJ noted that Plaintiff "has a history of bilateral knee pain that was managed conservatively with medication and injections during the period at issue." (R. at 21.) The ALJ also noted that Plaintiff believed these injections "were only marginally effective," but that "the treatment notes do not contain any findings of instability or significantly decreased range of motion upon physical examination." (R. at 21.) Regarding Plaintiff's mild carpel tunnel syndrome, the ALJ observed that Plaintiff "reported experiencing significant relief with bracing initially and upon follow-up." (R. at 21.) The ALJ also considered the conservative treatment of Plaintiff's elbow lateral epicondylitis. (R. at 22.) And the ALJ noted that Plaintiff's back pain "ha[d] been treated conservatively with medication" and that "claimant reported that her symptoms were responsive to medication" to the point where she could perform yoga and cardiovascular exercise, albeit with "some discomfort." (R. at 22.) Ultimately, the ALJ observed that Plaintiff "reported significant improvement with conservative treatment, although she complained of residual pain and achiness." (R. at 22.) Thus, the ALJ appropriately concluded that Plaintiff's conservative treatment did not support the severity and persistence of the symptoms that she endorsed. *See*

*Dunn*, 607 F. App'x at 274-75 (if the claimant requires only conservative treatment, an ALJ may reasonably find that the alleged disability lacks the seriousness that the claimant alleges).

The ALJ also considered other regulatory factors in analyzing Plaintiff's subjective complaints, including the measures that Plaintiff used to relieve her pain or other symptoms.  20 C.F.R. § 404.1529.  For example, the ALJ noted that Plaintiff "use[d] a cane twice a week and walker two to three times a month when she [appeared] in public and [had] to do a lot of walking with no sure opportunity to sit."  (R. at 20.)  The ALJ also noted that Plaintiff "use[d] a cane indoors at times."  (R. at 20.)  Nonetheless, after considering "the evidence in the record as a whole, including examination findings, diagnoses, treatment, the claimants reported activities of daily living and all opinions the undersigned afford evidentiary weight[,]" the ALJ concluded that Plaintiff "was limited to a reduced range of sedentary work accounting for postural and manipulative limitations, a sit/stand opinion, and assisted ambulation."  (R. at 24.)

Upon review of the ALJ's decision, the Court finds that the ALJ properly followed the requisite two-step process in determining: (1) whether Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; and, (2) whether Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms proved consistent with the medical and other evidence of record.  20 C.F.R. § 404.1529; *Craig*, 76 F.3d at 594-95.

## 2. Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Subjective Complaints.

Substantial evidence supports the ALJ's finding that Plaintiff's subjective statements "concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record."  (R. at 21.)  Indeed,

Plaintiff's medical records, as well as her own testimony, indicate that Plaintiff did not suffer from the severity of symptoms that she alleged.

During the hearing, Plaintiff testified that she used a cane twice per week and a walker two to three times per month after her knee surgery. (R. at 40.) She also stated that she could stand for only five minutes and walk for only three minutes without stopping to rest. (R. at 42-43.) But Plaintiff repeatedly exhibited normal gait and muscle tone during physical examinations both before and after her knee surgery. (R. at 290-91, 293, 318, 320-22, 324, 329, 331, 333, 335, 377, 458.) Plaintiff also exhibited a full range of motion in her wrists and strong grip strength during multiple appointments, which contradicted her testimony that she "had a habit of dropping things" due to numbness in her right hand. (R. at 45, 294, 305, 313.) These normal physical examination results support the ALJ's credibility determination.

Plaintiff testified that she experienced pain on the right side of her back, aching knees and stiffness and swelling in her right hand. (R. at 42.) And Plaintiff rated her back pain as a 6 out of 10 with medication. (R. at 42.) Despite Plaintiff's complaints of pain, the record shows that Plaintiff's wrist, hand and back pain responded positively to conservative treatment. While bracing and injections provided Plaintiff with significant relief from her wrist and hand pain, her back pain responded well to medication. (R. at 290, 294, 296-97, 311.) Although cortisone injections only provided temporary relief for Plaintiff's knee pain, she reported improvement after undergoing a successful knee replacement surgery. (R. at 433, 439-47, 455-57.) Moreover, Plaintiff did not always pursue additional treatments recommended by her care providers, including physical therapy, injections and medications, which suggests that her conditions lacked the severity that she alleged. (R. at 291, 293, 311.) Plaintiff's positive response to both

27

conservative treatment and knee surgery contradicts her subjective complaints of pain and supports the ALJ's decision.

Lastly, Plaintiff's own testimony undermines her subjective complaints.  During the hearing, Plaintiff could not recall ever taking a yoga class, but in August 2012, Plaintiff reported to Dr. Krushinski that she had been able to start exercising, including "yoga and occasional cardio."  (R. at 52-53, 290.)  Plaintiff further testified that she could get up and dress herself without assistance.  (R. at 49.)  She affirmed that she could send texts on her phone, vacuum, load the dishwasher, sweep and wash her own clothing.  (R. at 47-48, 50.)  And Plaintiff homeschooled her daughter.  (R. at 56.)  Moreover, Plaintiff did not originally leave work due to her allegedly debilitating symptoms; rather, she left to take maternity leave.  (R. at 58-59.)

Ultimately, substantial evidence supports the ALJ's determination that Plaintiff's subjective statements concerning the intensity, persistence and limiting effects of her symptoms proved inconsistent with the evidence of record.  Accordingly, the ALJ did not err.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 8) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 10) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of**

28

any right to a de novo review of the determinations contained in the report and such failure

shall bar you from attacking on appeal the findings and conclusions accepted and adopted

by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  January 3, 2019